E-FILED
Friday, 19 January, 2007  05:04:11 PM
Clerk, U.S. District Court, ILCD

OAO91 (Rev. 12/03) Criminal Complaint

# UNITED STATES DISTRICT COURT

_____CENTRAL_____ DISTRICT OF _____ILLINOIS_____

UNITED STATES OF AMERICA
V.
CARL DICKERSON and FREDARYL DAVIS

**FILED**
JAN 19 2007
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

**CRIMINAL COMPLAINT**

Case Number: 07-M- 7206

(Name and Address of Defendant)

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about __Feb. 2006 to July 2006__ in _____Macon_____ County, in
(Date)
the _____Central_____ District of _____Illinois_____ defendant(s) did,

(Track Statutory Language of Offense)
knowingly conspire to distribute cocaine and cocaine base ("crack"),

in violation of Title ____21____ United States Code, Section(s) ____841(a)(1) and 846____.

I further state that I am a(n) __Detective, Decatur Police Department__ and that this complaint is based on the
                                          Official Title
following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part of this complaint:    ☒ Yes    ☐ No

s/C. Ramey
_____
Signature of Complainant

Chad E. Ramey
_____
Printed Name of Complainant

Sworn to before me and signed in my presence,

1/19/2007                                                  at    Urbana,                Illinois
Date                                                              City                   State

David G. Bernthal        U.S. Magistrate Judge            s/David G. Bernthal
Name of Judge            Title of Judge                   Signature of Judge

# AFFIDAVIT

I, Detective Chad Ramey, being first duly sworn, hereby state:

Introduction

1. I am a Detective with the Decatur Police Department and have been a Police Officer for a period of 12 years and for the past 8 years I have been assigned to the Street Crimes Unit. During this time I have conducted and or participated in numerous narcotic investigations in the Decatur, Macon County, Illinois area as well as conducted and participated in numerous investigations jointly with members of local law enforcement in the Central District of Illinois. These investigations involved the detection and investigation of drug trafficking violations, including distribution and manufacture of controlled substances, conspiracy to distribute and manufacture controlled substances and the use of communication facilities such as telephones, digital pagers, and other like facilities commonly used to facilitate drug trafficking violations.

2. This affidavit is made in support of a criminal complaint and arrest warrant charging Carl J. Dickerson, a.k.a. "JG" and his cousin, Fredaryl Davis, a.k.a. "Durb", with conspiracy to distribute cocaine and cocaine base ("crack") in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 846.

3. I am familiar with the following facts through my own observation and investigation and through information officially supplied to me by other law enforcement agents.

The Initial Investigation of Dickerson

4. In early 2006, information was learned concerning the distribution of kilogram amounts of cocaine by Dickerson, Davis, and others in Decatur, Illinois.

5. A criminal history check showed that Dickerson was convicted in Macon County in 2001 for possession of a controlled substance with intent to deliver. He was paroled to the Decatur area with an address of 150 S. Hilton, Decatur Illinois.

6. Intermittent surveillance over several months in 2006 observed Dickerson operating the following vehicles:

a. White Lincoln Town Car.

This care is registered to Vivian Clark, ███████ in Decatur Illinois. Vivian Clark was the mother of Jacobe and Jerry Jarrett, both of whom were observed with Dickerson and Davis on multiple occasions.

On May 15, 2006, Vivian Clark was murdered. Nevertheless, surveillance observed Dickerson driving the car after Clark's murder. On June 9, 2006, new registration for the car was obtained in Vivian Clark's name.(2) Red 1997 Land Rover registered to Lutaushia Walker at ███████ in Decatur Illinois. Lutaushia was found to be a girlfriend to Carl Dickerson.

b. Gray Chevrolet Impala

This car is registered to Lutaushia Walker, ███████ in Decatur Illinois.

7. Surveillance identified ▮▮▮▮▮▮▮▮▮▮ Decatur, as another address associated with Dickerson. Investigation determined this apartment was rented by a Diondray Tate.

The Initial Investigation of Davis

8. In 2006, surveillance and investigation determined that Fredaryl Davis was living and renting a house at ▮▮▮▮▮▮▮▮▮▮. He was living in the house with his girlfriend, Keyanna Buckley, and their children.

9. Additional surveillance and investigation identified ▮▮▮▮▮▮▮▮▮▮ Decatur, as another address associated with Davis. This apartment is rented by Alisha Pirtle. Investigation determined that she has a young child with Davis.

10. Additional investigation determined that Davis pays the rent on the apartment with business checks in the name of "Durbs Detail Shop." This is a car detailing business Davis owned for a short period of time located at 1004 E. Eldorado, Decatur, Illinois.

11. Intermittent surveillance over several months in 2006 observed Davis operating the following vehicles:

    a. Maroon Oldsmobile

This car is registered to Davis' girlfriend, Keyanna Buckley, 2580 Euel, Decatur.

b. White Cadillac

This car is registered to Davis using the address of his car detailing shop, 1004 E. Eldorado, Decatur.

c. Gray Lincoln Navigator

This car is registered to Alisha Pirtle, ▇▇▇▇▇▇▇▇▇▇ Decatur.

d. Maroon Chevrolet Impala

This car is registered to Kenyata Harper, ▇▇▇▇▇▇▇ Decatur.

Ronnie Blount Traffic Stop

12.   On February 27, 2006, at approximately 8:30 a.m., an Illinois State Police officer was on patrol on southbound Interstate 57 in Iroquois County. Near milepost 298, he observed a Ford F150 pickup truck approaching the rear of his vehicle at what appeared to be a high rate of speed. After apparently observing the police officer, the driver of the truck reduced speed and stayed approximately 100 feet behind. The officer reduced his speed below the speed limit and the truck passed the officer in the left lane. As the truck was passing, the officer could see that the driver, a female, was not wearing her seatbelt. After passing the police officer, the truck increased its speed. The officer then paced the truck at 75 miles per hour for about one half mile. At approximately milepost 295, the officer activated his emergency lights and pulled the truck over.

-4-

13. The truck had a temporary Illinois registration. The officer ran the registration number through his computer and learned that it was registered to Enterprise Rental Car.

14. The officer then approached the driver who identified herself as Natasha R. Johnson. As the officer was approaching, he observed Johnson put her seatbelt on. When he got to the driver's window, he told her it was too late, he had already seen her driving without it. The officer also told Johnson that she had been driving over the 65 mile an hour speed limit. She looked nervous and repeatedly looked back and forth between the police officer and a male passenger in the front seat of the vehicle. The passenger identified himself as Carl J. Dickerson.

15. The officer asked Johnson for her driver's license and for the rental agreement for the truck. The male passenger handed the rental agreement to the officer. The agreement identified the renter as a "Ramona Harper" and specified that there was to be no other driver on the vehicle other than the renter. The officer contacted Enterprise Rental Car. The company requested that the truck be towed and secured because the renter was not present.

16. After the occupants were removed, the officer searched the interior of the vehicle. One of the items he found was a McDonalds food bag. When he picked it up, he noticed that it was heavy, weighing several pounds. He opened the bag and discovered a receipt from a McDonalds in Calumet City dated with February 27, 2006, a double cheeseburger, and a brown plastic grocery bag which contained several clear

plastic bags filled with cocaine base ("crack"). (The cocaine base ("crack") was later forensically analyzed with positive results and a weight of approximately 1150 grams).

17. Johnson, the driver, and the male passenger were transported to Illinois State Police headquarters in Ashkum. After running criminal history information on Carl J. Dickerson, including the photograph, it became obvious that the male passenger's name was not Carl J. Dickerson. Subsequent investigation determined that he was really Ronnie E. Blount.

18. Blount was subsequently indicted by the Grand Jury on March 16, 2006, for possession of 50 or more grams of cocaine base ("crack") with the intent to distribute, in violation of 21 U.S.C. 841(a)(1).

Cedric Applewhite Traffic Stop And Initial Statement

19. On May 28, 2006, approximately three months after Blount's traffic stop and arrest, Cedric Applewhite was stopped and arrested by the Monticello Illinois Police Department for possession of approximately 250 grams of powder cocaine.

20. The stop began at approximately 11:54 p.m. when Applewhite was stopped driving his westbound on I-72. Applewhite's girlfriend, Korann Lynch, was the passenger. Applewhite's car was driving was registered to both Cedric Applewhite and Fredaryl Davis, ▉▉▉▉▉ in Decatur, Illinois.

21. During the traffic stop, on the floorboard in plain view was a plastic bag containing approximately 250 grams of powder cocaine.

22.    In a subsequent interview of Applewhite, he stated that he had been driving back and forth to Chicago several times a week to obtain cocaine for two subjects in Decatur by the names of Fredaryl Davis and "JG." (Investigation has identified "JG as Carl Dickerson).

Applewhite's Interview

23.    During another interview on May 28, 2006, Applewhite stated that he lived at ███████, Decatur. He also stated that he has several relatives living in Decatur, including his nephews, Fredaryl Davis and Carl Dickerson. Applewhite then admitted that Davis and Dickerson were responsible for distributing large amounts of cocaine in Decatur.

24.    Applewhite further admitted that he is aware that Dickerson and Davis both sell cocaine together, and often obtain the cocaine together from a source in Chicago. According to Applewhite, Davis and Dickerson rarely drive to Chicago and obtain the cocaine themselves.

25.    Applewhite also stated that Dickerson's relative, Ronnie Blount, was driving to Chicago and obtaining the cocaine for Dickerson and Davis, but earlier in the year Blount was arrested for a large amount of cocaine which he was transporting back from Chicago.

26. Applewhite further advised that in 2005, he moved to Decatur. Shortly thereafter, Dickerson introduced him to Ronnie Blount. Later in 2005, Blount contacted Applewhite and asked him about driving Blount to Chicago to obtain cocaine because Blount did not have a valid drivers license.

27. Applewhite agreed to do so. On the first occasion, Blount contacted Applewhite by telephone and asked him to drive him to Chicago to obtain cocaine. Applewhite agreed, and a short time later, Blount arrived at Applewhite's home in a blue van which belonged to Dickerson.

28. Applewhite and Blount then drove to Chicago. Once they arrived in Chicago, Blount contacted his source and they were directed to a meeting location in the Chicago area for the cocaine transaction to occur. Once Applewhite and Blount were at the meeting location, Blount left the van, met with his source (who was unknown to Applewhite) and returned to the van with the cocaine.

29. Once back in Decatur, Blount contacted Dickerson by cell phone. Dickerson then directed Blount to a location where they could meet. Blount then dropped off Applewhite and drove to meet Dickerson.

30. According to Applewhite, this procedure was essentially repeated on three or four different occasions. Additionally, on one occasion, A woman went with Applewhite and Blount to Chicago to obtain cocaine.

31. Applewhite was then shown a photo line-up containing a known photograph of Natasha Johnson, the driver of the rented truck in which Blount was stopped. Applewhite identified Johnson as the female that accompanied them to Chicago.

32. Applewhite stated there was only one occasion when he was told exactly how much cocaine was obtained. This occurred because Dickerson did not provide Blount with the correct amount of money for the cocaine purchase. On this occasion, Blount told Applewhite that he was only able to obtain six ounces of crack cocaine and three ounces of powder cocaine.

33. In January and February, 2006, Applewhite lived in Princeton, Illinois, and did not make any trips with Blount to Chicago . In approximately March, 2006, Applewhite returned to live in Decatur. Once back in Decatur, Applewhite was contacted by Davis and Dickerson both of whom talked to Applewhite if he would began driving to Chicago to obtain their cocaine.

34. Once Applewhite agreed to make the trips to Chicago, Davis purchased the 1994 Oldsmobile for Cedric and registered the car in Davis' and Applewhite's names.

35. Applewhite then began to make three to four trips a week to Chicago. Sometimes he would obtain the cocaine for either Dickerson or Davis separately, but often times he would obtain cocaine for both of them on the same trip.

*Trips for Dickerson*

36. Dickerson usually obtained the cocaine in "crack" form. The smallest amount Dickerson purchased was three to four ounces of crack cocaine; on at least two separate occasions, Applewhite drove to Chicago at Dickerson's direction, obtained a kilogram of crack cocaine, returned to Decatur, and delivered the crack cocaine to Dickerson.

37. The majority of times Applewhite drove to Chicago and obtained cocaine for Dickerson, he met Dickerson at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ rented by Diondray Tate.

38. On at least five to six different occasions, Dickerson directed Applewhite to go to the apartment and drop off the cocaine to Diondray Tate. Dickerson told Applewhite he would obtain the cocaine from Tate later.

39. Applewhite was paid $300 to $400 per trip by Dickerson, and if he made a trip for both Dickerson and Davis, he was usually paid $700.

40. Applewhite estimated he transported a combined total of approximately 10 kilograms of crack cocaine for Dickerson from Chicago to Decatur in March, April and May, 2006.

*Trips for Davis*

41.     Applewhite advised that when he transported cocaine for Davis, Davis always obtained a full kilogram of cocaine. Further, Davis usually obtained the cocaine in a half powder, half crack cocaine form. Applewhite estimated he transported approximately 15 kilograms of cocaine from Chicago to Decatur for Davis.

42.     When he returned to Decatur with Davis' cocaine, Applewhite usually met Davis at the apartment of Alisha Pirtle, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. On at least five to six different occasions, Davis was unable to meet with Applewhite and directed Applewhite to drop off the cocaine to Alisha Pirtle.

Controlled Cocaine Purchases

43.     On March 22, 2006, a confidential informant (hereinafter, "CI") was equipped with a recording device ("body wire"). Shortly thereafter, surveillance units located Dickerson and a recorded telephone call was made to Dickerson by the CI.

44.     During the telephone conversation, Dickerson agreed to meet the CI and sell him one quarter ounce of crack cocaine.

45.     After the telephone conversation, Dickerson was observed driving directly to 2470 Country Trails and parking in the parking lot. (Surveillance units were unable to see the specific apartment building Dickerson entered). A few minutes later, Dickerson walked back to his car and drove directly to the predetermined meeting location.

46. Meanwhile, at approximately the same time, the CI and car were searched; no contraband was located. At this point, the CI was given the agreed amount of money for the purchase of the crack from Dickerson. The CI was then followed directly to the meeting location where he met Dickerson.

47. Once the meeting was completed, Dickerson was followed out of the area. The CI was also followed directly to a predetermined meeting location where he met with investigating agents. The CI gave the agents two plastic bags which contained approximately five grams of cocaine base ("crack"). The CI and his car were also searched again; no contraband was located.

48. On June 27, 2006, another controlled purchase was made from Dickerson. The CI met the investigating agents and he and his car were searched; no contraband was located. The CI was equipped with a body wire while surveillance units located Dickerson.

49. The CI made a recorded telephone call to Dickerson, and during the conversation, Dickerson agreed to sell the CI one quarter ounce of crack cocaine. During the conversation, Dickerson told the CI that he needed to obtain the cocaine.

50. Once this conversation was over, Dickerson was followed directly to ▓▓▓▓ ▓▓▓▓▓▓▓▓▓ where he met with Davis. Surveillance units than observed Davis entering building 2470. This is the building in which Davis' girlfriend, Keyanna Buckley, lived in apartment #▓▓.

51. Shortly thereafter, Davis left the building and met Dickerson back in the parking lot. Davis and Dickerson then switched cars; Dickerson drove Davis' white Cadillac to the meeting location for the transaction with the CI.

52. Meanwhile, the CI was given the agreed amount of money for the purchase of the crack from Dickerson. The CI was then followed directly to the meeting location where he met Dickerson.

53. Once the meeting was completed, Dickerson was followed from the area. The CI was also followed directly to a predetermined meeting location where he met with investigating agents. The CI gave the agents two plastic bags which contained approximately five grams of cocaine base ("crack"). The CI and his car were also searched again; no contraband was located.

54. On July 3, 2006, the CI was equipped with a body wire. Shortly thereafter, surveillance units located Dickerson and a recorded telephone call was made to Dickerson by the CI.

55. During the telephone conversation, Dickerson agreed to meet the CI and sell him one quarter ounce of crack cocaine.

56. Once the conversation was over, Dickerson drove directly to the agreed meeting location for the transaction..

57. Meanwhile, at approximately the same time, the CI and car were searched; no contraband was located. At this point, the CI was given the agreed amount of money for the purchase of the crack from Dickerson. The CI was then followed directly to the meeting location where he met Dickerson.

58. Once the meeting was completed, Dickerson was followed out of the area. The CI was also followed directly to a predetermined meeting location where he met with investigating agents. The CI gave the agents two plastic bags which contained approximately five grams of cocaine base ("crack"). The CI and his car were also searched again; no contraband was located.

Diondray Tate and Sparkle Jarrett

59. On July 7, 2006, a state search warrant for ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was obtained and executed as part of the investigation. This was the apartment rented by Diondray Tate. When the warrant was executed, the only person in the apartment was a woman named Sparkle Jarrett.

60. During the search, in a kitchen cabinet approximately 275 grams of powder cocaine, and approximately 42 grams of suspected crack cocaine along with digital scales were found.

61. Sparkle Jarrett was transported to police headquarters and interviewed. Sparkle stated that she and Diondray Tate allowed Carl Dickerson to store cocaine in their apartment. Sparkle stated Dickerson usually stored the cocaine in the freezer or the kitchen cabinet.

62.  Jarrett also stated that Davis brought cocaine to the apartment to package, but she did not know if Davis ever stored cocaine in the apartment.

63.  Diondray Tate was also interviewed. Tate stated that Dickerson was his friend and that he allowed him to store cocaine in the apartment over the past several months. Tate explained that Dickerson brought the cocaine to the apartment and either stored it in the freezer, or sometimes in the bedroom closet.

64.  Tate added that Davis also stored cocaine in the apartment for several months, but had recently began storing the cocaine at an apartment across the street. (This was later determined to be ███████████████████████)

65.  Tate further stated that on July 6, 2006, Davis came to the apartment and brought cocaine with him. Davis asked if he could store the cocaine in the apartment and Tate agreed. Davis placed the cocaine in the cabinet; this was the same cocaine discovered during the search warrant.

66.  Tate stated that Dickerson's uncle (Cedric Applewhite) was driving to Chicago and bringing the cocaine back for Dickerson. On at least five or six occasions, the uncle would drop the cocaine off at Tate's apartment for Dickerson to retrieve later.

<u>Natasha Johnson</u>

67. On December 11, 2006, Natasha Johnson, the driver of the rental truck in which Ronnie Blount was stopped, was interviewed. She stated that she had known Ronnie Blount and his cousin "JG" for several years. (She identified Carl Dickerson as "JG"). She said she had made approximately four to five trips to Chicago with Ronnie Blount in 2005 and 2006.

68. Johnson advised that around November, 2005, Blount and another older man came to her home. Blount asked her if she wanted to take a ride with him. She agreed to do so.

69. Johnson said they began driving around and ended up driving to Chicago in a blue van; the older man drove the van. They eventually drove to a home, and then returned to a home, then returned to Decatur. On this occasion, Johnson did not see any cocaine.

70. The second time, Blount arrived at Johnson's house driving the same blue van He asked her to drive him to Chicago for $100; she agreed. Blount then directed her as they drove to Chicago. When they were nearing Chicago, Blount directed her to drive to the town of Harvey.

71. Once in Harvey, Blount directed her to park in a Popeye's Chicken parking lot. Blount removed a duffle bag from the van and walked around the building. He was gone for about 10 minutes. When he returned, he went to the rear compartment of the van, placed something inside, and got back in the passenger seat. They then drove directly back to Decatur.

72. The third time, she again drove him to Harvey in the blue van, but this time, Blount informed her he was going to Chicago to obtain some cocaine and that it was for "JG." She again drove to Harvey and parked in the same parking lot. Blount again walked away from the lot carrying a duffle bag, returned with the bag and placed something in the rear compartment. She was paid for this trip.

73. Johnson said the fourth time she again drove the van, but when they arrived in the Chicago area she was directed to drive to a different location. Blount met with another man and, according to statements made by Blount to Johnson, obtained some cocaine, but she did not know how much. She was paid for this trip.

74. She said the fifth and final time she traveled to Chicago with Blount was when they drove the rental truck to Chicago and were stopped.

Ramona Harper

75. On January 8, 2007, Ramona Harper was interviewed. (Harper was the renter of the truck in which Johnson and Blount were stopped). Harper stated that she has known Dickerson for several years. Further, her best friend is Lataushia Walker, a girlfriend of Dickerson.

76. Johnson advised that in the months of January and February, 2006, she was dating Eddie Smith. She knew that Smith was an associate of Dickerson and Davis. (On November 2, 2006, Smith was indicted on for possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g). He entered a guilty plea on December 4, 2006, and is currently awaiting sentencing).

77. Johnson stated she has rented two vehicles from Enterprise, one being the truck in which Ronnie Blount was arrested. The other vehicle was a Ford Taurus approximately two weeks prior. Johnson explained that Lataushia Walker asked her to rent a vehicle for Dickerson. She agreed because Dickerson helped pay a cellular telephone bill for Johnson. Dickerson and Walker gave her a ride to Enterprise Rent-A-Car where she rented the Taurus. Dickerson provided her with the cash to rent the car. Once she had the car, she drove the vehicle from the lot and met Dickerson and Walker in a nearby parking lot. At that time, she handed the car over to Dickerson. Dickerson drove the car for approximately one week.

78. Johnson further stated that about two weeks later her boyfriend, Eddie Smith, asked her to rent a vehicle for him. He gave her cash to rent the vehicle. She asked Walker to give her ride to Enterprise, which she did.

79. Johnson rented a truck and gave it to Smith. Smith drove it for about two days. On that weekend, Smith told her that Dickerson had paid him the money for the rental truck car and that Dickerson was now driving it.

80. Several days later, she was at work when she received a call from Smith telling her she needed to come home. She drove to College and Packard where Dickerson and Smith met her. She was told by Dickerson and Smith that the police had arrested someone driving the truck and that she needed to pick it up. Shortly thereafter, she was contacted by Enterprise and told they had taken custody of the truck.

FURTHER AFFIANT SAYETH NOT.

s/C. Ramey
_____
CHAD E RAMEY, Detective
Decatur, Illinois Police Department


Subscribed and sworn to before me this 19th day of January, 2007.


s/David G. Bernthal
_____
DAVID G. BERNTHAL, Magistrate Judge
United States District Court